751 So.2d 754 (2000)
FLORIDA DISTILLERS and Humana Workers' Compensation Services, Appellants,
v.
Johnny RUDD, Appellee.
No. 1D97-4370.
District Court of Appeal of Florida, First District.
March 1, 2000.
*755 Debrah L. Zeitler of Moore & Peterson, P.A. and Nicholas A. Shannin of McDonough, O'Dell, Beers & Wieland, Orlando, for Appellants.
Susan W. Fox of Macfarlane Ferguson & McMullen, Tampa and H. Guy Smith of Smith & Feddeler, P.A., Lakeland, for Appellee.
VAN NORTWICK, J.
In this worker's compensation appeal, Florida Distillers and Humana Workers' Compensation Services, jointly the employer/carrier, challenge an order which awarded indemnity benefits, including permanent and total disability benefits, and medical treatment to Johnny Rudd, the appellee and claimant below. We affirm as to all eight issues raised on appeal, although we write on only three issues.

Factual and Procedural Background
On July 28, 1995, while working as a forklift operator, Rudd lifted a propane fuel tank weighing approximately 100 pounds. As he was doing so, Rudd heard "pops" in his back and immediately experienced back pain radiating into both legs causing him to fall to his knees. The accident was reported and, after some initial delay in responding to Rudd's request for treatment, the employer/carrier authorized treatment by Lowell Zeid, M.D., a general practitioner. Prior to the workplace accident of July 28, 1995, Rudd had been under the care of Robert Martinez, M.D., a board certified neurologist, for treatment of injuries sustained in a motor vehicle accident on January 25, 1994. Rudd presented to Dr. Martinez after the workplace accident as well. On August 29, 1995, after Dr. Martinez had been told of the workplace accident, an MRI was performed which revealed disc bulging at L3-4 and L4-5. Several weeks after the accident, Rudd left his job with the employer, because pain prevented him from working.
In addition to the treatment for his back injuries prior to the workplace accident, Rudd also received treatment for depression from a licensed clinical social worker, Debra Segal, and from a psychiatrist. Rudd was last seen by Segal on June 1, 1995, approximately two months before the workplace accident. After the workplace accident, Rudd reported difficulty sleeping and experienced consistent depression and suicidal ideation. The employer/carrier authorized Charles Dack, M.D., a psychiatrist, to conduct an evaluation, and he diagnosed Rudd as suffering from major depression. Dr. Dack recommended psychiatric treatment, and the employer/carrier authorized Dr. Dack to render such treatment. Dr. Dack placed Rudd at maximum medical improvement (MMI) from a psychiatric point of view on September 12, 1996, with a 5% permanent impairment relating to the body as a whole, which Dr. Dack opined was causally related to the workplace accident.
Rudd presented to Arturo Gonzalez, M.D., a psychiatrist, on July 12, 1996. *756 Like Dr. Dack, Dr. Gonzalez diagnosed major recurrent depression, which was causally related to Rudd's workplace accident. He found Rudd totally disabled given his psychiatric condition. At a follow-up examination, Dr. Gonzalez continued to be of the opinion that Rudd was totally disabled. He did not agree that Rudd had reached MMI, but, when asked to assume that Rudd had reached MMI on September 12, 1996, as opined by Dr. Dack, Dr. Gonzalez opined that Rudd sustained somewhere between a 26% to a 30% permanent impairment as a result of the workplace accident of July 28, 1995.
Rudd sought temporary total disability (TTD) and/or temporary partial disability (TPD) benefits from the date of the accident until June 11, 1996, the date of MMI as to Rudd's neurological condition, as well as permanent total disability (PTD) benefits from the date of MMI. Rudd also sought past and future medical care as the nature of the injury and the process of recovery required.
Following an extensive hearing, the JCC found that Rudd sustained a compensable accident on July 28, 1995, which resulted in both physical and psychiatric injuries. Rudd was awarded TPD benefits from July 28, 1995 through August 25, 1995, TTD benefits from August 26, 1995 through September 11, 1996, and PTD benefits commencing on September 12, 1996. Further, the JCC awarded past and future medical care by Dr. Martinez and palliative medical care and treatment, including but not limited to, psychiatric care. The decretal portion of the order does not specify that a specific physician is to render the necessary psychiatric care.

Weight Given Findings in Social Security

Disability Proceeding
The employer and carrier argue that there is no competent substantial evidence to support the JCC's award of PTD benefits. Appellants further contend that, in awarding such benefits, the JCC erred in failing to give persuasive weight to the findings of a federal administrative law judge, who had denied Rudd's claim for social security disability benefits shortly before the merits hearing in Rudd's worker's compensation proceeding. We find that the record contains competent substantial evidence in the testimony of Dr. Gonzalez and Dr. Martinez to support the JCC's award of PTD benefits.
With respect to the appropriate weight to be given findings of an administrative law judge in a social security disability proceeding, this court observed in Alachua County Adult Detention Ctr. v. Alford, 727 So.2d 388, 391 (Fla. 1st DCA 1999), that the legislature has adopted the social security disability standard for catastrophic injury as a prerequisite for obtaining PTD benefits in those cases where a claimant does not have one of the permanent impairments listed in section 440.02(34), Florida Statutes (Supp.1994). Further, the legislature has required a claimant receiving PTD benefits to apply for social security disability benefits. See § 440.15(1)(f)2.b., Fla. Stat. (Supp.1994); Ace Disposal v. Holley, 668 So.2d 645 (Fla. 1st DCA), rev. denied, 676 So.2d 1368 (Fla. 1996); see also Alachua County Adult Detention Ctr., 727 So.2d at 391. By these amendments to chapter 440 the legislature sought to "shift the burden of financing and underwriting the costs of PTD from the employer and carriers of this state to the broader shoulders and deeper coffers of the United States Treasury." City of Pensacola Firefighters v. Oswald, 710 So.2d 95, 100 (Fla. 1st DCA 1998).
Nevertheless, despite the statutory intent to render PTD status comparable to disability under the Social Security Act, we have been cited to no requirement in chapter 440 that a JCC is bound by the denial of a claim for social security disability benefits. The legislature could have easily included such a requirement when chapter 440 was substantially amended as a result of chapter 93-415, Laws of Florida, but it did not do so. Furthermore, given the fact *757 that the evidence may vary between a workers' compensation proceeding and a proceeding on a claim for social security disability benefits through no fault of the claimant, it would be unjust to view federal disability determinations as carrying binding precedential authority in a proceeding under chapter 440, Florida Statutes.

Application of Managed Care System
The employer/carrier argue that Rudd's petition for worker's compensation benefits was required to be dismissed because the employer/carrier had entered into a managed care arrangement pursuant to section 440.134, Florida Statutes (1994), and Rudd failed to file a grievance under the managed care system. See § 440.134(15), Fla. Stat. (1994). Below, the JCC rejected this argument, finding insufficient evidence that a managed care system was in place at the time of the workplace injury to Rudd. Further, the JCC reasoned that the fact the case had been docketed to him by a docketing order of the Department of Labor and Employment Security, Office of the Judge of Compensation Claims, with the finding that the petition for benefits was consistent with all statutory requirements, was indicative that a managed care system was not in place.
We note that, even if a managed care arrangement had been in place at the time of the workplace accident, dismissal of the entire petition for benefits, as sought by the employer/carrier, would not be appropriate. The existence of a managed care arrangement would be relevant to the claim for medical treatment, but would not be dispositive of the claim for indemnity benefits. See § 440.134(16), Fla. Stat. (Supp.1994)(when a carrier enters into a managed care system, employees covered by such an arrangement are deemed to have received all benefits to which they are entitled pursuant to section 440.13(2)(a) and (b), which pertains to medical treatment and authorized providers), see also Wiggins v. B.L. Servs., Inc., 701 So.2d 570 (Fla. 1st DCA 1997)(request for IME by physician outside of managed care network proper if IME is sought to resolve a dispute regarding entitlement to indemnity benefits). Further, based on the record before us, the employer/carrier has not demonstrated that the JCC was in error in concluding that there was insufficient evidence that a managed care system was in place at the time of Rudd's workplace accident.

Reliance on Unauthorized Provider
The employer/carrier also argue that the JCC erred in relying upon the testimony of Dr. Martinez who, as noted, had treated Rudd for neck and upper thoracic back injuries sustained in an automobile accident on January 24, 1994. Following the workplace accident of July 28, 1995, Rudd presented to Dr. Martinez on August 14 and August 29, 1995, without authorization from the carrier. The employer/carrier argue that not only was Dr. Martinez not authorized, but that past and future treatment by both Dr. Martinez and Dr. Gonzalez is not compensable because neither physician belong to the managed care system which the employer/carrier assert was in effect at the time of the workplace injury to Rudd.
The record reflects that Rudd sought treatment from a neurologist when he filed a request for assistance on August 19, 1995. The employer/carrier authorized an independent medical evaluation (IME) by an neurologist, William Malzone, M.D., which was conducted on November 21, 1995, but treatment by a neurologist was never authorized. Rudd is entitled, therefore, to seek treatment and recover the costs of that treatment, section 440.13(2)(c), and the JCC was not obliged to exclude the records and opinions of Dr. Martinez on the ground that he was not an authorized physician. Because the employer/carrier did not offer treatment with a neurologist, the instant case is distinguishable from Lakeland Reg'l Med. Ctr. v. Murphy, 695 So.2d 895 (Fla. 1st DCA 1997).
*758 Further, for the reasons explained in the immediately preceding section of this opinion, the employer/carrier's argument that the JCC improperly relied upon the opinions of Dr. Martinez and Dr. Gonzalez, because those physicians are not within the managed care system, is an argument without merit.
Accordingly, the order under review is AFFIRMED.
BOOTH AND PADOVANO, JJ., CONCUR.