770 So.2d 172 (2000)
WALGREEN COMPANY and Kemper Insurance Company, Appellants,
v.
Lori CARVER, Appellee.
No. 1D99-4411.
District Court of Appeal of Florida, First District.
August 30, 2000.
Rehearing Denied October 26, 2000.
Eric R. Eide, Esquire, and John M. Crotty, Esquire, of Grower, Ketcham, More, Rutherford, Noecker, Bronson, Siboni & Eide, P.A., Orlando, for Appellants.
Thomas E. Thoburn, Esquire, and Bill McCabe, Esquire, of Shepherd, McCabe & Cooley, Longwood, for Appellee.
*173 BENTON, J.
Walgreen Company and Kemper Insurance Company appeal a final order awarding Lori Carver permanent total disability benefits, supplemental benefits, palliative care with Dr. Ramirez, costs and attorney's fees. The order rests on a finding that Ms. Carver suffers from trauma-induced fibromyalgia, despite the contrary opinion of the expert medical advisor (among others). We reverse.
While working on May 25, 1996, Ms. Carver, then thirty-five years old, wrenched her back in removing a "merchandise tote" from a stack in a Walgreen stockroom. She testified that the tote was heavier than she had expected. Not one of the doctors who examined her was of the opinion that she was unable to work, once she reached maximum medical improvement on September 16, 1996.
For purposes of the Workers' Compensation Law, permanent, total disability entails catastrophic injury as defined in section 440.02, Florida Statutes (1995). See § 440.15(1)(b), Fla. Stat. (1995). In the absence of one of the permanent impairments listed in section 440.02, the Legislature has adopted the social security disability standard for catastrophic injury. See § 440.02(34)(f), Fla. Stat. (1995); Florida Distillers v. Rudd, 751 So.2d 754, 756 (Fla. 1st DCA 2000); Alachua County Adult Detention Ctr. v. Alford, 727 So.2d 388, 391 (Fla. 1st DCA 1999). The social security disability standard employs a fivestep test. See 20 C.F.R. § 404.1520; Foote v. Chater, 67 F.3d 1553, 1557 (11th Cir.1995).
Ms. Carver does not have a listed impairment. Her entitlement to workers' compensation permanent total disability benefits hinges on the fourth and fifth steps of the social security disability standard, which ask whether she can perform her past work (which included work as a cosmetologist) and, if not, whether, taking into account her age, education and past work experience, she can do other work available in the national economy. See 20 C.F.R. § 404.1520(e) & (f); Foote, 67 F.3d at 1557. That Ms. Carver had been denied social security benefits as of the time of the hearing before the judge of compensation claims (whereupon she requested a hearing before a federal administrative law judge) is not dispositive. See, e.g., Rudd, 751 So.2d at 756.
The only testimony in the present proceeding that Ms. Carver was permanently, totally[1] disabled came from a vocational expert, William Hoeffner, who indicated that an assumed diagnosis of fibromyalgia was a "key factor" in his evaluation of Ms. Carver's employability. He testified, however, that Ms. Carver would, in his opinion, be capable of sedentary or light work, if the judge of compensation claims accepted the opinions of the doctors who concluded that Ms. Carver did not suffer from fibromyalgia.
Because of conflict in the medical opinion, an expert medical advisor was appointed. See Palm Springs Gen. Hosp. v. Cabrera, 698 So.2d 1352 (Fla. 1st DCA 1997). The expert medical advisor, Dr. Imfeld, initially reported:
She has pain from head to toe in the back.... She was tender to very light palpation in most of the areas in the lumbar paraspinals, quadratus lumborum, upper buttock, greater trochanteric region, and sciatic notch area. She was tender in all those places with very, very light touch. She did have positive Waddell's. She was positive for tenderness, overreaction, regionalization, distraction and simulation maneuvers. Simulation *174 maneuvers was [sic] positive with rotation of the whole trunk and minimal pressure over the top of the head.
After this initial examination, he concluded that Ms. Carver "may have a non-physiological reason for" her apparent pain but that there was "no objective reason to show that she could not work in the medium category."
Dr. Imfeld testified that he had understood that the purpose of the initial examination was to determine whether Ms. Carver needed further treatment for her back before returning to work. When asked to perform a second examination specifically to ascertain whether she suffered from fibromyalgia, he did so and reported thatunlike the 125 to 175 people he had personally treated for fibromyalgia over a period of eleven yearsMs. Carter did not meet the criteria.
In the expert medical advisor's opinion, Ms. Carver exhibited significant signs of pain magnification.[2] He testified that Ms. Carver had reported tenderness to palpation in areas where fibromyalgia would not produce pain. In addition to Dr. Imfeld, Dr. Kurtz and Dr. Cooper also testified that Ms. Carver exhibited significant indications of pain magnification, non-physiological symptoms and symptom and disability exaggeration. A functional capacity evaluation ordered by Dr. Gosselin reached the same conclusion.[3]
An expert medical advisor's opinion is presumed to be correct and may only be rejected on the basis of clear and convincing evidence. See § 440.13(9)(c), Fla. Stat. (1999). We have said that an expert medical advisor's opinion has "nearly conclusive effect." Pierre v. Handi Van, Inc., 717 So.2d 1115, 1117 (Fla. 1st DCA 1998) (dicta). It creates a presumption that can be overcome only by "evidence... of a quality and character so as to produce in the mind of the JCC a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established [and therefore the falsity or inaccuracy of the expert medical advisor's opinion]. Slomowitz [v. Walker], 429 So.2d [797] at 800 [(Fla. 4th DCA 1983)]. See also Westinghouse Elec. Corp. v. Shuler Bros., Inc., 590 So.2d 986, 988 (Fla. 1st DCA 1991)." McKesson Drug Co. v. Williams, 706 So.2d 352, 353 (Fla. 1st DCA 1998).
The judge of compensation claims nevertheless rejected the expert medical advisor's opinion here as "impaucible [sic] and without credibility." According to the order under review, the basis for rejection was twofold: Dr. Imfeld did not specifically rule fibromyalgia in or out on first examining Ms. Carver, and he did not produce a medical text or article specifically supporting his statement that "red flags are raised" with respect to a diagnosis of fibromyalgia when a patient reports tenderness to light touch all over her body rather than only upon deep muscle palpation at diagnostically significant points.
But Dr. Imfeld's failure to address fibromyalgia as such during the initial examination logically reflects as much on the drafting of the order appointing an expert medical advisorwhich makes no reference to fibromyalgiaas on the doctor's "credibility." Nor does Dr. Imfeld's inability *175 or unwillingness to produce medical literature at his deposition (to support what some might see as a commonsense proposition) afford a reasonable basis for concluding that his diagnosis was clearly and convincingly shown to be mistaken.
Indeed, of seven physicians who saw the claimant, only one testified that (as the judge of compensation claims found) she suffered from trauma-induced fibromyalgia. Her treating physicians unanimously rejected this diagnosis. Two of her treating physicians (Dr. Gosselin, an orthopedist, and Dr. Cooper, who practices occupational and environmental medicine) concluded that she did not suffer from fibromyalgia and questioned the validity of such a diagnosis in any case. The report of a third treating physician (Dr. Golovac, a pain management specialist) ruled out fibromyalgia.
One of her own independent medical evaluation physicians (Dr. Hunter, a specialist in physical medicine and rehabilitation) believed fibromyalgia was a legitimate diagnosis in certain cases and said Ms. Carter might (or might not) have it but emphatically rejected the suggestion that trauma could have caused it. Her other independent medical evaluation physician (Dr. Ramirez, a rheumatologist) supported the diagnosis, while the employer's and carrier's independent medical evaluation physician (Dr. Kurtz, a physical medicine and rehabilitation specialist) did not.
Diagnosing fibromyalgia requires applying four kilograms (roughly ten pounds) of pressure to a series of more or less symmetrical "trigger points" scattered throughout the musculature in the trunk and the extremities and noting the patient's responses. In cases of fibromyalgia, palpation of these trigger points elicits muscular banding and rigidity, which differs from what is found at tender places where a patient reports pain to very light touch. A patient's responses to palpation of these trigger points can be cross-matched and "checked" against control areas including areas such as the forehead or bony jointsto validate (or invalidate) a finding of fibromyalgia.
Dr. Ramirez, the only physician who diagnosed fibromyalgia, reported that Ms. Carver's chief complaint was "[a]ches and pains all over" but that, as of his first examination, she had "already ... studied the [pamphlet] regarding fibromyalgia." He testified that his diagnosis was based on the objective criteria of palpated trigger points, but acknowledged that a clinical diagnosis of fibromyalgia depends on an accurate report of pain and symptoms by the patient.[4]
Like Dr. Ramirez, Dr. Imfeld reported that he had palpated each of the requisite trigger points, and that Ms. Carver had reported tenderness to very light touch. Assuming the accuracy of her reports, he testified, they indicated skinrather than muscularpain, some malady other than fibromyalgia. Dr. Ramirez did not contradict the testimony that Ms. Carver reported pain that could not be attributed to fibromyalgia. Dr. Kurtz testified that Ms. Carver's pain responses invalidated or "failed to confirm" a diagnosis of fibromyalgia. He also testified that Ms. Carver did not exhibit a reproducible pattern of tenderness in the trigger points.
Although "the appellate court's function is not to conduct a de novo proceeding," McKesson Drug Co. v. Williams, 706 So.2d at 354, the appellate court does have to decide whether there was a reasonable basis for rejecting an expert medical advisor's opinion as clearly and convincingly disproven. When viewed in light of the record as a whole, the reasons the judge of compensation claims gave for rejecting Dr. Imfeld's opinion do not constitute "competent substantial record evidence which the judge could reasonably find to be clear and convincing." Jacaranda *176 Manor v. Randolph, 755 So.2d 781, 782 (Fla. 1st DCA 2000).
Accordingly, we reverse the order under review and remand for further proceedings consistent with this opinion.
BARFIELD, C.J., and WEBSTER J. CONCUR.
NOTES
[1] Ms. Carver did suffer a permanent partial impairment, some witnesses testified. Dr. Gosselin, a treating physician who diagnosed chronic back pain secondary to a lumbar strain, assigned a permanent impairment rating of three percent, an assessment Dr. Kurtz characterized as "generous." Nobody assigned a permanent impairment rating of more than three percent. At least one physician testified Ms. Carver had no permanent impairment at all.
[2] Dr. Imfeld testified that when Ms. Carver believed she was being tested to determine the degree to which she could bend her legs at the hip while lying on her back, she reported pain at between thirty and sixty degrees. Later, while in a sitting position, when she believed another part of her body was being tested, she reported no pain, even though her legs were bent at the hip a full ninety degrees. Dr. Kurtz also reported inconsistent results in a series of distraction tests, indicating that she was exaggerating or fabricating her pain symptoms. Dr. Imfeld testified that Waddell's signs or tests, on which he said Ms. Carver scored five out of a possible five, included pain overreaction and pain localization tests.
[3] The evaluation resulted in a work capacities assessment that concluded, inter alia: "Waddell's test score was in the HIGH range for Magnified Illness Behavior."
[4] Despite his diagnosis, Dr. Ramirez agreed with every other physician who offered an opinion that Ms. Carver was capable of going back to work.