BENTON, J.,
dissenting.
Because the order on appeal fails to afford the opinion of the expert medical advisor the presumption of correctness to which it is entitled, I respectfully dissent. Absent clear and convincing evidence of adequate grounds for rejecting it, the opinion of the expert medical advisor binds the judge of compensation claims. See Palm Springs Gen. Hosp. v. Cabrera, 698 So.2d 1352, 1356 (Fla. 1st DCA 1997).
The opinion of the expert medical advis- or is presumed to be correct unless there is clear and convincing evidence to the contrary as determined by the judge of compensation claims.
§ 440.13(9)(c), Fla.Stat. (Supp.1994). See Walgreen Co. v. Carver, 770 So.2d 172, 174-75 (Fla. 1st DCA 2000) (holding evidence insufficient to overcome presumption of correctness); Jacaranda Manor v. Randolph, 755 So.2d 781, 781-82 (Fla. 1st DCA 2000) (holding presumption overcome based “on competent substantial record evidence which the judge could reasonably find to be clear and convincing”).
Patty Schmitt’s treating physician’s testimony was at odds with that of, among others,[1] .the other rieurologists who testified as to “medical evidence supporting the employee’s complaints or the need for additional medical treatment.” § 440.13(9)(c), Fla. Stat. (Supp.1994). Accordingly, the judge of compensation claims appointed a board-certified neurologist, Thomas G. *466 Hoffman, as expert medical advisor. Dr. Hoffman’s expert medical opinion was requested as to whether Ms. Schmitt had a seizure disorder or other neurological problems and, if so, whether they were caused by the shock she said she experienced on June 20, 1994, while using her right hand to operate a computer mouse as she was performing secretarial duties for Wuesthoff Memorial Hospital (Wues-thoff).[2] The expert medical advisor’s report concludes:
In summary, Ms. Schmitt suffered an electrical shock to the right hand at work in June 1994. She had no burns. Although some patients with this type of injury may report some subjective sensory symptoms for a while afterward, it is inconceivable that this type of minor injury would result in any long term permanent sequelae. Ms. Schmitt has developed a plethora of symptoms which I am unable to relate to this injury. Her neurologic exam is normal and there are no objective findings.
Regarding seizures, I note that there is no objective evidence for epilepsy. Multiple EEGs which I reviewed are normal. If there is a serious question regarding seizures then other advanced studies such as 24 hour ambulatory monitoring or combined EEG video monitoring might be helpful. Of course, I cannot prove a negative hypothesis, that she does not have seizures, but I don’t think the evidence [that she does] is convincing. In addition, it would be next to impossible to relate the onset of epilepsy to this minor electrical shock.
I find Dr. Hooshmand’s management of the patient to be unusual and generally inconsistent with generally accepted standards of care in the area of neurology-
Based on his examination of Ms. Schmitt and his review of her medical records, including results of the tests her treating physician had ordered, Dr. Hoffman could not relate any of her symptoms to the events of June 20, 1994. He could not, indeed, find objective evidence of any neurological injury. He testified that the absence of any burns, any entrance or exit wound, and the fact that Mr. Schmitt did not lose consciousness when she felt the shock all suggested that no serious injury had occurred. Dr. Hoffman noted that Ms. Schmitt claimed she had severe seizures every couple of months but said she had never bitten her tongue or suffered incontinence, even though tongue biting and incontinence are common symptoms in persons who are really having epileptic seizures.
If Ms. Schmitt had suffered a serious injury to the nervous system on June 20, 1994, Dr. Hoffman testified, the injury would normally have manifested itself shortly thereafter (during “the acute period”). Dr. Hoffman would not expect a seizure disorder to manifest itself for the first time two years after a neurological injury had been sustained. To like effect, Dr. R. Ayyar, who is board certified in neurology and electromyography, opined that Ms. Schmitt’s current condition was not caused by anything that happened on June 20, 1994.[3] He, too, felt it was highly *467 unlikely that a person would develop a seizure disorder as a result of, but two years after, an accident. He could find no evidence that Ms. Schmitt had suffered any injury to her brain or nervous system as a result of any electric shock.
On the other hand, Hooshang Hoosh-mand, who Dr. Newman said was well-known among fellow neurologists in the community “[a]s a convicted felon,” saw the case differently. Dr. Hooshmand, who began treating Ms. Schmitt more than a year after the incident at work, concluded that Ms. Schmitt had “myoclonic seizures secondary to the lightening [sic] strike [sic] injury,” and ascribed essentially all of Ms. Schmitt’s complaints [4] — these included neck pain, low back pain, pain in the upper and lower extremities, bladder problems, hearing loss, weakness of the right leg, confusion, poor short-term memory, periods of amnesia, blurred vision and photo-phobia — to the industrial accident. He diagnosed her condition as “more like a sympathetic disfunction but not” reflex sympathetic dystrophy. Reflex sympathetic dystrophy was Dr. Hooshmand’s original diagnosis, according to his notes, but all who testified on the point, including ultimately Dr. Hooshmand, agreed Ms. Schmitt did not suffer from this condition.
About a year after starting treatment with Dr. Hooshmand (approximately two years after the injury), Ms. Schmitt allegedly began having seizures (petit and grand mal). She said these seizures were the reason she stopped working for Wues-thoff in December of 1996.[5] Dr. Hoosh-mand testified that, when there is a question whether a person’s seizures are true seizures or pseudo-seizures, the proper protocol is to use placebos.[6] But he did not follow that protocol in Ms. Schmitt’s case, he said, because her symptoms were “so typical of electrical shock injury.” When pressed, however, Dr. Hooshmand admitted that evidence did exist that suggested pseudo-seizures. By any objective measure, Dr. Hooshmand’s opinion that the computer mouse incident caused a delayed-onset seizure disorder is not “of a quality and character so as to produce in the mind of [a reasonable judge of compensation claims] a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established.” McKesson Drug Co. v. Williams, 706 So.2d 352, 353 (Fla. 1st DCA 1998); see Walgreen Co., 770 So.2d at 174-75.
Nothing in the order under review suggests that the judge of compensation claims treated the opinion of the expert medical advisor as presumptively correct. The order does not state that the record contains clear and convincing evidence contrary to the expert medical advisor’s opinion.[7] Instead, the order treats the expert medical advisor’s opinion no differ *468 ently than any other medical expert’s opinion. The order states:
In analyzing the evidence I find that Dr. Hooshmand is exceptionally qualified in diagnosing and treating the residuals of electrical shock injury as he has specialized in this area of medicine over 30 or more years. His practice has during that period focused on complex pain cases including electrical shock injury and he has published widely in this area.
[[Image here]]
I feel that based on his experience and focus in the relevant area that Dr. Hoosh[ma]nd is the more qualified and I accept his opinions over the other medical professionals where they are in conflict.
The judge of compensation claims also found, with respect to the expert medical advisor he appointed:
On deposition, the doctor testified he was not an expert in electrical shock injuries. In fact, the doctor stated that he had seen only a hand full of electrical shock patients over his many years of practice. His opinions were disputed by Dr. Hooshmand.
These findings do not suggest that the judge of compensation claims gave any deference whatsoever to the expert medical advisor’s opinion. To recapitulate, the expert medical advisor stated his impression, as follows:
1. History of electrical shock injury to the right arm in June 1994 without objective evidence of any sequelae.
2. Multiple subjective symptoms without objective physical correlate and a normal examination.
At no time does the judge of compensation claims even expressly reject the opinion of the expert medical advisor. The order under review does not meet the requirements of section 440.13(9)(c), Florida Statutes (Supp.1994). I would reverse.

. Other physicians who testified, including a neurosurgeon and every neurologist except the treating physician (Hooshang Hoosh-mand), offered opinions which were fully consonant with the expert medical advisor's opinion. Like these specialists, Dr. Joseph Uricchio, an orthopedic surgeon who performed an independent medical examination on behalf of the employer and the servicing agent, indicated that Ms. Schmitt’s test results were all within normal limits.

. She testified that she felt the shock in her right arm but that she suffered no burns nor any other entrance or exit wound. She did not lose consciousness but did feel some numbness and tingling in her right arm. She was off work for three days after which she felt fine. She testified she was shocked at or about the time that lightning struck outside. Lightning did not strike her or the building. The evidence did not establish whether any damage was done to the computer. As far as the record shows, none was. Dr. Hoffman accepted her account of the incident as did the judge of compensation claims.

. Dr. Fairuz Matuk, a neurosurgeon who examined Ms. Schmitt on January 20, 1995, and March 29, 1996, opined that Ms. Schmitt’s cervical problems were not causally related to the 1994 incident. He felt that her neck and arm pain could be caused by preexisting spondylolisthesis rather than any electrical injury. A full clinical examination revealed no abnormalities. Neither he nor Dr. Richard Newman, another neurologist who examined Ms. Schmitt before any report of seizures, found any indication of reflex sympathetic dystrophy or any other neurological deficit.

. Originally, Ms. Schmitt took three days off work, after which she felt fíne. Two weeks later she had symptoms on account of which she consulted a gynecologist, who eventually referred her to a neurologist for evaluation of spinal stenosis in the cervical region. Neither of these physicians could link her symptoms to the events of June 20, 1994. On July 11, 1995, she went to see Dr. Hooshmand as a patient, after attending a seminar he had given. By this time, the list of her subjective complaints had grown considerably.

. The alleged seizures were also the primary reason her vocational expert concluded that Ms. Schmitt was permanently and totally disabled.

. Dr. Ayyar suggested that a twenty-four-hour ambulatory electroencephelogram could definitively determine whether Ms. Schmitt really had a seizure disorder. But Dr. Hooshmand claimed that conventional elec-troencephelograms are not sensitive enough to detect the type of injury that Ms. Schmitt purportedly had.

.The judge of compensation claims did not state that he "relied on the testimony of Dr. Hooshmand to determine the statutory presumption of correctness with regard to the expert medical advisor’s opinion was overcome by clear and convincing evidence.” Ante, at 465. The words "clear and convincing” do not appear in the order under review and the order does not specify what evidence was deemed sufficient to overcome the presumption of correctness that attached to the expert medical advisor’s opinion.