829 So.2d 346 (2002)
Elizabeth DRAMIS, Appellant,
v.
PALM BEACH COUNTY SCHOOL BOARD and F.A. Richards and Associates, Inc., Appellees.
No. 1D01-4266.
District Court of Appeal of Florida, First District.
November 1, 2002.
*347 David J. Weissman and Randy D. Ellison of Rosenthal & Weissman, P.A., West Palm Beach, for Appellant.
Brian P. Knight of Conroy, Simberg, Ganon, Krevans & Abel, P.A., Hollywood, for Appellees.
KAHN, J.
In this workers' compensation case, appellant challenges an order of the judge of compensation claims (JCC) denying her indemnity benefits because she sought medical care outside of the managed care network of the employer/carrier (E/C). We find that a claimant's decision to seek medical care outside of the E/C's network does not bar her entitlement to indemnity benefits, and we reverse the order on appeal.
Appellant, Elizabeth Dramis, injured her back in a compensable accident on April 20, 2000, while working as a teacher for the Palm Beach County School Board. Dramis went to an emergency room that evening because of pain; she was given pain medication and instructed to rest until she could see a doctor. On April 25, 2000, Dramis saw Dr. J.B. Phillips, who was authorized by the E/C pursuant to its managed care plan. Dr. Phillips examined Dramis and his initial impression was that she had a lumbosacral sprain/strain. He prescribed a muscle relaxant and returned Dramis to work with restrictions; a follow-up was scheduled for April 29, 2000. Dramis did return to work the next day but, because of continued pain, Dramis contacted Dr. Phillips' office and Dr. Phillips prescribed a pain medication. Dramis then made an appointment with Dr. Emilio Musso through her private health insurance. After April 26, 2000, Dramis did not return to work until August 2000.
Dr. Musso saw Dramis on April 27, 2000. He ordered an MRI for the next day and, as a result, diagnosed a herniated disc. Dr. Musso put Dramis on bed rest. In June 2000, Dramis sought treatment from Dr. David Campbell, also through her private health insurance. Dr. Campbell, a board certified orthopedic surgeon, recommended physical therapy and steroid injections. In August 2000, Dramis returned to work, although with difficulty.
Dramis never returned to see Dr. Phillips. In May 2000, she received a letter from the E/C's managed care nurse advising that she had missed her follow-up appointment with Dr. Phillips and should reschedule the appointment. Dramis spoke to the nurse about the missed appointment and the nurse explained "the gatekeeper system" and that Dramis would have to see a gatekeeper before getting a referral to a specialist. Dramis *348 chose to continue treating with her health insurance doctors instead of using the E/C's managed care plan.
Dramis subsequently filed a petition for benefits seeking, among other things, temporary total disability (TTD)/temporary partial disability (TPD) benefits from April 26, 2000, through August 10, 2000. The JCC denied the requested benefits and made the following findings:
5. I find that the Claimant could have worked in her regular job as a school teacher within the restrictions given by Dr. Phillips, but did not do so. She instead chose to go outside of the managed care network for medical care. I find that if the Claimant felt she could not work with the restrictions assigned, she should have either returned to Dr. Phillips or chosen another gatekeeper for continuing medical care. The Claimant chose not to do so.
6. I accept the testimony of Dr. Phillips that the Claimant would have been given a same day appointment on April 26, 2000 if the Claimant had requested one.
7. I have considered the Claimant's testimony that she understood the managed care policy which required her seeing the gatekeeper for referrals or the need to request an alternate gatekeeper, but that the policy did not make sense to her. The Claimant did not feel that seeing another gatekeeper would be of any use to her.
8. The Claimant treated with Dr. Campbell since June 6, 2000 on an unauthorized basis and Dr. Campbell was paid through the Claimant's private health carrier. The first visit authorized by the Carrier was on July 10, 2001 for purposes of the Claimant's IME.
9. I find that there is no competent, substantial evidence presented by the Claimant to support a claim for temporary total disability benefits from April 26, 2000 through August 10, 2000 as no authorized physician took her off work.
10. As to the claim for temporary partial disability benefits, I rely upon the opinion of Dr. Phillips that the Claimant was capable of returning to work after the accident. If she felt unable to do so, she should have returned to Dr. Phillips or an alternate authorized physician for follow-up care. She did not do so. By failing to return to work within her restrictions, the claimant voluntarily limited her income.
11. I rely upon the case law submitted by the Employer/Carrier, namely, Farhangi v. Dunkin Donuts, 728 So.2d 772 (Fla. 1st DCA 1999) and Lobnitz v. Orange Memorial Hospital, 126 So.2d 739 (Fla.1961) in finding that the Claimant did not offer the Employer/Carrier the opportunity to reduce its liability by providing proper medical treatment pursuant to its Managed Care arrangement. Pursuant to the Farhangi case, this Court has no authority to award medical treatment outside of the managed care arrangement or to otherwise "strike" the managed care arrangement.
On appeal, Dramis argues that the order erroneously denied indemnity benefits only because she chose to seek medical care outside of the E/C's managed care arrangement. In response, the E/C argue that the JCC did not deny benefits for this reason and, further, propose that competent substantial evidence supports the denial of benefits.
Our reading of the order persuades us the JCC denied the claim after concluding that Dramis presented "no competent, substantial evidence ... to support a claim for temporary total disability benefits ... as no authorized physician took her off work." The JCC relied on the opinion of *349 Dr. Phillips that Dramis was capable of returning to work and noted, "if she felt unable to do so, she should have returned to Dr. Phillips or an alternate authorized physician for follow-up care." Thus, in effect, the JCC denied the claim because Dramis did not accept treatment from authorized physicians, that is, physicians in the E/C's managed care network. Instead, Dramis chose to use her private health insurance and select her own physician, Dr. Campbell. Dramis also selected Dr. Campbell as her independent medical examination (IME) physician, so his testimony was admissible in the proceeding before the JCC. See § 440.13(5)(e), Fla. Stat. (1999) ("No medical opinion other than the opinion of a medical advisor appointed by the judge of compensation claims or division, an independent medical examiner, or an authorized treating provider is admissible in proceedings before the judges of compensation claims.").
The JCC made extensive findings regarding Dr. Campbell's testimony, including findings that Dr. Campbell causally related Dramis's condition (herniated disc in the low back) to her accident, Dr. Campbell indicated Dramis was on a no work status from June 6, 2000, through August 10, 2000, and Dr. Campbell testified that Dramis should have been on a no work status before he began treating her. Nevertheless, the JCC evidently chose, from her other findings quoted above, not to consider this testimony, finding as a matter of law it did not constitute competent substantial evidence, only because Dr. Campbell was not authorized. This was error.
This court has previously determined, "When an employee is covered under a managed care arrangement ..., the JCC has authority to determine indemnity benefits, but lacks authority to determine entitlement to medically necessary remedial treatment, care and attendance if the claimant has not exhausted existing managed care procedures." Weather Eng'rs v. Presgraves, 774 So.2d 938, 939 (Fla. 1st DCA 2001). Although this case law (distinguishing between claims for indemnity benefits and medical benefits in situations where an E/C has managed care arrangement) has developed in the context of entitlement to an IME, the principles therein are equally relevant to claims for TTD/ TPD benefits. See, e.g., id., 774 So.2d at 939 (finding that JCC did not have authority to order psychiatric IME at E/C's expense before claimant exhausted managed care procedures where claimant sought IME to obtain medical treatment, not indemnity benefits); Wiggins v. B & L Servs., Inc., 701 So.2d 570, 572 (Fla. 1st DCA 1997) ("[D]enial of claimant's request [for IMEs] was proper if the purpose of the IMEs was the resolution of a dispute regarding the provision of medical treatment, care, or attendance, but was improper if the purpose of the IMEs was to resolve a dispute regarding entitlement to indemnity benefits."). See also Castro v. AT & T Wireless Servs., Inc., 780 So.2d 917, 918 (Fla. 1st DCA 2000) ("Although the JCC retained jurisdiction to determine indemnity benefits, the JCC lacked jurisdiction to determine entitlement to medically necessary care and treatment pending resolution of the grievance proceedings."); Fla. Distillers v. Rudd, 751 So.2d 754, 757 (Fla. 1st DCA 2000) (noting that "even if a managed care arrangement had been in place at the time of the workplace accident, dismissal of the entire petition for benefits, as sought by the employer/carrier, would not be appropriate").
Indeed, in Wiggins, the court explained, "A straightforward reading of the statutes at issue indicates that the managed care provisions were intended to govern only the E/C's provision of `medically necessary remedial treatment, care, and attendance' *350 under subsections 440.13(2)(a) and (b)...." 701 So.2d at 572 (emphasis added). Similarly, in another case, this court stated, "The existence of a managed care arrangement would be relevant to the claim for medical treatment, but would not be dispositive of the claim for indemnity benefits." Rudd, 751 So.2d at 757. The same rationale leads us to conclude that a claimant's refusal to participate in an E/C's managed care arrangement does not act as a bar to a claimant's right to seek indemnity benefits.
As noted above, the E/C argue that competent substantial evidence supports the JCC's denial of benefits in this case. In particular, the E/C point to the testimony of Dr. Phillips that Dramis could return to work after her injury. Dr. Phillips, however, testified that after he saw Dramis for the first (and only) time on April 25, 2000, he returned her to work light duty. After this one visit, Dramis never returned to see Dr. Phillips, although she did call the next day, after she had worked for a half-day, complaining of extreme pain and he prescribed Darvocet. Dr. Phillips was not asked about Dramis's ability to work or her work status at that point or at any point thereafter. In addition, Dr. Phillips' initial impression, that Dramis had only a lumbosacral sprain/strain, proved erroneous. Thus, Dr. Phillips' testimony does not support the JCC's decision to deny indemnity benefits for the time period at issue, that is, April 26, 2000, through August 10, 2000. Importantly, this is not a case where the JCC simply chose to believe the testimony of one doctor over another. See, e.g., Jefferson Stores, Inc. v. Rosenfeld, 386 So.2d 865, 865 (Fla. 1st DCA 1980) ("It is the deputy's function to determine credibility and resolve conflicts in the evidence, ... and he may accept the testimony of one physician over that of several others...."). Here, the JCC refused, for inadequate legal reasons, to consider Dr. Campbell's testimony.
Contrary to the JCC's determination, Dramis did present competent substantial evidence to support her claim. The JCC refused to consider Dr. Campbell's testimony as competent substantial evidence merely because he was not authorized by the E/C. Because the JCC also noted that Dr. Campbell's testimony supported Dramis's claim and because the E/C produced no contrary evidence, we REVERSE with directions that indemnity benefits be awarded as requested.
MINER, and WEBSTER, JJ., CONCUR.